**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GLENN BURLACK,

       *Plaintiff*,

    v.

LONNIE G. BUNCH, III, Secretary,
Smithsonian Institution,

       *Defendant*.

Civil Action No. 23‑2032 (SLS)

Judge Sparkle L. Sooknanan

**MEMORANDUM OPINION**

Glenn Burlack works at the National Museum of the American Indian, a component of the Smithsonian Institution. In 2021, as the COVID–19 pandemic abated, Mr. Burlack's supervisors directed him to return to on-site work. Besides a few days, he did not do so for over two months. Mr. Burlack attributes that lapse to a mental health crisis brought on by his disabilities. As an accommodation for those disabilities, Mr. Burlack requested and received a partial telework schedule. Nevertheless, he faced significant friction with his supervisors surrounding these events during late-2021 through late-2022. In 2023, he sued the Secretary of the Smithsonian Institution, alleging that the Museum's conduct violated Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973. He contends that the Museum discriminated against him based on his national origin and disabilities, retaliated against him because of his protected activity, and failed to accommodate his disabilities. The Secretary now moves for summary judgment. Although the Court understands that Mr. Burlack feels that his supervisors' conduct was unfair, the evidence before the Court does not permit these claims to survive summary judgment.

**BACKGROUND**

A.    **Factual Background**

The Court draws the facts from the Parties' Joint Statement of Undisputed Facts, their respective statements of fact, and the underlying materials referenced in those statements. *See* Def.'s Statement of Material Facts Not in Genuine Dispute (DSOF), ECF No. 36-1; Pl.'s Resp. to DSOF (PSOF), ECF No. 37-1; Def.'s Resp. to PSOF, ECF No. 40-1; Joint Statement of Undisputed Facts (JSOF), ECF No. 39. The Court assumes the facts in those statements to be true unless they have been specifically disputed. *See* Fed. R. Civ. P. 56(e)(2); *see also* LCvR 7(h)(1) ("[T]he Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.").

Glenn Burlack has worked at the National Museum of the American Indian, a component of the Smithsonian Institution, since 1995. *See* JSOF ¶¶ 1, 3. He serves as a "Management Support Specialist" in the Museum's Public Programs unit, which puts on live performances and programs for the public. JSOF ¶¶ 3–5, 9. Mr. Burlack's job duties include setting up and breaking down programs, working with performers, and other administrative tasks related to the Museum's live programming. *See* JSOF ¶¶ 9–13. Mr. Burlack's immediate supervisor is Janet Clark, and Ms. Clark's supervisor is Shawn Termin. JSOF ¶¶ 6, 8. He identifies his national origin as "Native American, of the Lumbee nation." JSOF ¶ 102. And he has been diagnosed with Major Depressive Disorder, Social Phobia Disorder, and Generalized Anxiety Disorder. JSOF ¶ 45.

1.    **Mr. Burlack's Return to In-Person Work**

During the COVID–19 pandemic, the Museum was forced to shut down its public operations, including live programming. *See* JSOF ¶ 16. Employees in the Public Programs unit thus switched to remote work. *See* JSOF ¶ 28. But as the pandemic abated and the Museum

reopened to the public, the Public Programs unit returned to in-person work. Ms. Termin set Mr. Burlack's return for September 1, 2021, scheduling him to work in person five days a week, Wednesday through Sunday. JSOF ¶ 29. Mr. Burlack affirmed to Ms. Termin that he was prepared to return in person. JSOF ¶ 30.

But on September 1, Mr. Burlack did not report for work. *See* PSOF ¶ 43. He emailed Ms. Clark saying that he felt sick and would take the day off. *Id.* Mr. Burlack also did not report for work on September 2 or 3. PSOF ¶ 45. Ms. Clark emailed Mr. Burlack and told him that because it was his "3rd day in a row calling in sick, [she] need[ed] a doctor's note verifying that [he] ha[d] not been able to come to work." PSOF ¶ 46. By September 16, Mr. Burlack still had not returned to work, had not submitted any request for leave in the Smithsonian's attendance system, and had not provided a doctor's note to Ms. Clark. PSOF ¶ 47.[1]

Mr. Burlack's attendance issues continued in the weeks and months that followed. In late September 2021, after consulting with other Museum employees, Ms. Clark issued Mr. Burlack a counseling memorandum. PSOF ¶¶ 48–50. The memorandum stated that Mr. Burlack had "still not returned to work" and had "requested emergency/unscheduled leave on each of [his] scheduled

---

[1] Mr. Burlack's Response to the Defendant's Statement of Material Facts Not in Genuine Dispute, ECF No. 37-1, purports to admit in part and deny in part many of the facts in this section. But Mr. Burlack's objections appear to be based on inferences that might be drawn from the facts as stated. For instance, he avers that his medical issues caused his lapse in attendance—but he does not appear to dispute the accuracy of the Defendant's description of the events surrounding that lapse. *See, e.g.*, PSOF ¶¶ 43, 45–47. Indeed, in responding to these portions of the Defendant's Statement of Material Facts, Mr. Burlack cites only his own declaration, which itself appears to concede the relevant facts. *See, e.g.*, *id.*; Burlack Decl. ¶¶ 11–13, 22, ECF No. 37-3. As another example, in response to the Defendant's assertion that Ms. Clark sent Mr. Burlack emails about his telework accommodation, Mr. Burlack appears to object only to an inference that Ms. Clark's emails were consistent with the Museum's legal obligations—not that the Defendant describes Ms. Clark's emails inaccurately. *See, e.g.*, PSOF ¶¶ 105, 108–09. Because Mr. Burlack has not specifically disputed the accuracy of these facts as described, the Court assumes that they are true. *See* Fed. R. Civ. P. 56(e)(2); LCvR 7(h)(1). What inferences might be drawn from those facts is, of course, the question to be answered in this summary judgment posture.

workdays since September 1, 2021." PSOF ¶ 53. It further stated that "on several occasions," Mr. Burlack had "not followed proper leave procedures when requesting emergency leave." PSOF ¶ 54. And it requested that Mr. Burlack provide "administratively acceptable evidence or medical certification within 15 days . . . for three (3) days or more absences." PSOF ¶ 55. Yet Mr. Burlack continued to miss work. *See* PSOF ¶¶ 57, 59–62. By October 12, Mr. Burlack had only reported to work once—and he still had not submitted any documentation of his medical issues. *See* PSOF ¶¶ 63–64. Finally, on October 13, 2021, Mr. Burlack sent Ms. Clark the following text message:

> Hi Janet, this is going to sound crazy but I need a break from NMAI. I have a doctor and will get Counceling [sic] the next couple days. Sorry but I gotta go. It will be hard but don't share too much of my situation. I can't get my truck and drive anywhere and Rox found out today. Let me know if this is ok but this is going on.

PSOF ¶ 66; JSOF ¶ 39; Burlack Decl. ¶ 22, ECF No. 37-3.

About two weeks later, Ms. Clark sent Mr. Burlack a "Proposal to Suspend," which charged him with absence without leave (AWOL) and failure to follow leave procedures. PSOF ¶ 69. It proposed to suspend Mr. Burlack for five days as discipline for his attendance issues. PSOF ¶ 68. And it advised that Mr. Burlack had ten days to respond before Ms. Termin would issue a decision. JSOF ¶ 41. Soon after Mr. Burlack received the Proposal to Suspend, his wife emailed Ms. Termin stating that Mr. Burlack had "been having a very difficult time" and had "experienced increasing depression and anxiety." JSOF ¶ 42. She asked Ms. Termin to "reconsider the suspension and instead look at allowing [Mr. Burlack] to take leave." *Id.* Mr. Burlack's response to the Proposal to Suspend came a month later, on November 30, when he submitted a doctor's note, dated November 17, 2021, stating that he was receiving treatment for mental health conditions and requesting "excused absences from work during September 2021 to present." JSOF ¶¶ 46, 47.

4

On January 6, 2022, Ms. Termin issued her decision. PSOF ¶ 81. Having considered Mr. Burlack's medical documentation, she declined to sustain the AWOL charge. PSOF ¶ 82. But she sustained the charge of failure to follow leave procedures—while also reducing the attendant discipline from a five-day suspension to a one-day suspension. PSOF ¶¶ 83–84. Following Ms. Termin's decision, the Museum retroactively corrected Mr. Burlack's timecards to change absences from being designated AWOL to a combination of annual leave, sick leave, compensatory time off, and leave without pay. JSOF ¶ 49.

For his part, Mr. Burlack contends that his attendance issues were out of his control. Most prominently, he says that at the beginning of September 2021, he "realized that [he] was experiencing a traumatic psychiatric event"—namely, that his "social phobia, anxiety and depression . . . rendered [him] unable to drive and return to work as scheduled." Burlack Decl. ¶ 11. These impairments, he continues, meant that he was "unable to communicate verbally or through e-email." *Id.* Thus, in his view, many of his absences and instances of tardiness from September to October 2021 were attributable to this ongoing "mental health crisis." *Id.* ¶¶ 15–19, 22. Mr. Burlack also says that issues with his truck explain some of his absences in mid-October. *Id.* ¶¶ 20–21.

### 2.    Mr. Burlack Requests Telework Accommodations

On November 30, Mr. Burlack also requested four disability accommodations:

- A modification of his work schedule to allow him to work in-person on Wednesday to Fridays but telework on Saturdays and Sundays—with his duty hours as 7:30 a.m. to 4:00 p.m.

- While working in-person on Wednesday to Fridays, an ability to work two one-hour shifts on the Museum floor and six hours at his desk.

5

- Intermittent approval of FMLA or other leave to complete follow-up treatments and evaluations one to three times a month with mental health providers.

- Replacing the AWOL charges from September 1 to November 30, 2021, with approved FMLA leave.

JSOF ¶ 52. About two weeks later, Ms. Clark sent Mr. Burlack an email approving the first three requests. JSOF ¶ 55. As for the fourth, although Ms. Clark denied removing the AWOL charges as an accommodation, JSOF ¶ 56, the Museum retroactively changed that designation following Ms. Termin's suspension decision, JSOF ¶ 49; PSOF ¶ 93 n.2.

Over the next several months, Mr. Burlack and Ms. Clark exchanged emails about the telework arrangement. In early January 2022, Mr. Burlack reported that he would need to "stay off [his] hip as much as possible" because of an upcoming surgery and requested "telework and virtual desk work until after [his] surgery." JSOF ¶ 57. Ms. Clark approved the request the next day and assigned him a telework-capable project. JSOF ¶¶ 59–60.

Over two months later, on March 11, 2022, Ms. Clark emailed Mr. Burlack stating that because he had finished the project, she wanted him to return to the prior arrangement that they had agreed on: in-person work Wednesday to Friday and telework Saturday and Sunday. PSOF ¶ 103; JSOF ¶ 64. Mr. Burlack responded that "[u]ntil surgery, [he could] not drive or walk with confidence" and that he would "not report 3/16 in person." JSOF ¶ 65. He sent Ms. Clark a doctor's note recommending that he work from home through April 11, 2022, and that he continue working from home for six weeks after his surgery. JSOF ¶ 66. In response, Ms. Clark told Mr. Burlack that she had "no more administrative telework for [him]" because there was "simply no administrative telework available." PSOF ¶ 108. She told him that he could continue teleworking on Saturdays and Sundays—when he could work shifts at the virtual welcome desk, perform

6

miscellaneous administrative assignments, and complete his yearly training. PSOF ¶ 109. And she said that if he could not work on-site Wednesday to Friday, she would approve accrued leave and up to twenty-four hours of leave without pay each week. *See* PSOF ¶ 110. Mr. Burlack inquired whether "other units may need [his] support." JSOF ¶ 67.

Between April and July 2022, Mr. Burlack was primarily out on leave because of his hip surgery. JSOF ¶ 75. According to Mr. Burlack, when he returned to work on June 6, 2022, Ms. Clark told him that "there was no more telework available and that [he] was expected to work [his] entire schedule in-person." Burlack Decl. ¶ 97.

On July 28, 2022, he provided a doctor's note requesting an accommodation "of an in-person work schedule 2-3 days a week." JSOF ¶ 71. And three days later, he emailed Ms. Clark to tell her that his psychiatrist wanted him "to work on transitioning back to fully in person." JSOF ¶ 84. Ms. Clark granted that request and confirmed that he would continue to be limited to three on-site days a week. PSOF ¶ 119; JSOF ¶ 86. But Ms. Clark reiterated that the Public Programs unit had no telework projects and suggested that Mr. Burlack complete any required training and classes during his telework days. JSOF ¶ 87. She further advised that due to the lack of telework projects, Mr. Burlack would be allowed to take leave on days that he was not working in-person. PSOF ¶ 146. Mr. Burlack responded that he would soon be seeing his doctor to see if he would "be cleared 5 days a week." JSOF ¶ 88.

The next month, September 2022, Mr. Burlack emailed Ms. Clark and asked to discuss his schedule. JSOF ¶ 90. In response, Ms. Clark reminded him of his assurance that he would "discuss with [his] doctor when [he] could return to 5 days on-site." JSOF ¶ 91. Mr. Burlack agreed that he "always intended on going back to a M-F schedule." JSOF ¶ 92. Yet two weeks later, Mr. Burlack

submitted a letter from his psychiatrist requesting that he be given "a work schedule of no more than 3 days a week, in person or remotely." JSOF ¶¶ 95–96.

On January 31, 2023, Ms. Clark sent Mr. Burlack a memorandum stating that "the Smithsonian Institution (SI) require[d] a full-time employee to carry out the duties of [his] position." Mot., Ex. 72 at SI_3520, ECF No. 36-7; *see* JSOF ¶ 98; PSOF ¶ 161.

In his declaration, Mr. Burlack states that he provided Ms. Clark an additional physician's note on April 10, 2023, that reiterated his need for "accommodating [his] mental health conditions." Burlack Decl. ¶ 111. According to Mr. Burlack, Ms. Clark rejected the accommodation and told him "that there was no telework and she needed [him] on-site five days a week." *Id.*

### 3.     Mr. Burlack Looks for Work in Other Units

During the summer of 2022—while Mr. Burlack and Ms. Clark were exchanging emails regarding his telework schedule—Mr. Burlack also looked for work outside the Public Programs unit. In July, the Museum discovered a significant moth infestation at the Cultural Resources Center (CRC), a collections storage facility where the Museum stores most of its collection items not on public display. JSOF ¶¶ 76, 78. To support the collections staff's emergency response, the Museum solicited volunteers for telework tasks and work on-site at the CRC. JSOF ¶ 79. Volunteers needed their supervisor's permission. JSOF ¶ 80.

Early that August, Mr. Burlack emailed Carol Gover, the Equal Employment Opportunity (EEO) Program Manager at the Smithsonian, to discuss his accommodations. *See* JSOF ¶ 89; Burlack Decl. ¶ 107. Ms. Gover's notes from that call reflect that Mr. Burlack expressed that he wanted "to transfer to another unit." Mot., Ex. 61 at SI_3508, ECF No. 36-6. She told him that "changes of supervisors [were] outside of accommodations," but that they could "discuss

accommodation requests to supervisory methods." *Id.* Mr. Burlack also "asked about a detail to CRC." *Id.* Ms. Gover called Ms. Clark, who said that "she ha[d] onsite work for [Mr. Burlack] to perform." *Id.* And Ms. Gover's notes further explain that both Mr. Burlack and Ms. Clark "mentioned that he [would] return to M-F schedule." *Id.*

On August 31, Mr. Burlack called Cali Martin, the CRC manager in charge of the moth-infestation project, to express his interest in volunteering. *See* Burlack Decl. ¶ 100; JSOF ¶ 81; Opp'n, Ex. 23 at 3, ECF No. 37-25. In a follow-up email, Mr. Burlack wrote: "Per our phone call, could you confirm telework duties for two days." Opp'n, Ex. 23 at 3. Ms. Martin responded that she could not "assign tasks to someone from another department directly," but she added that "[w]e want this – you want this – we'll make it happen." *Id.* at 2. Mr. Burlack wrote back that he had "to show that [Ms. Martin] ha[d] telework and on-site work. Not to actually do it but justification for a detail or transfer." *Id.* He added that "[t]here [was] no telework for [him] now and [he was] supporting VS on the floor." *Id.* About two weeks later, Mr. Burlack again emailed Ms. Martin and asked to talk about CRC projects because Ms. Clark "seem[ed] to think [he didn't] have the skillset to complete the work." *Id.* at 1.

According to Mr. Burlack, between "mid-2022" and "mid-2025," the Smithsonian "stonewalled [his] continuous transfer requests as a form of reasonable accommodation." Burlack Decl. ¶ 110.

### 4.        Mr. Burlack's EEO Complaints

In addition to the conversation with Ms. Gover described above, Mr. Burlack contacted the Smithsonian's EEO office at several points. He first reached out on December 1, 2021, JSOF ¶ 106, one day after he responded to Ms. Clark's Proposal to Suspend. Shortly after, he submitted an intake form stating that he had been discriminated against on the basis of "Mental and Emotional

Disability" because he was "charged with 233 hours of AWOL" and "given a proposed five (5) day notice of suspension." Carilli Decl., Ex. A at 37–38, ECF No. 36-8; JSOF ¶ 107.

On February 18, 2022—about a month after Ms. Termin's suspension decision—Mr. Burlack filed a formal complaint of discrimination alleging discrimination based on national origin ("Native American") and disability ("Mental & Emotional Health"), as well as retaliation ("November 30th Letter"). Carilli Decl., Ex. B, ECF No. 36-8; JSOF ¶ 108. The complaint again noted that he had been "charged with 233 hours of AWOL" and "given a proposed five (5) day suspension." *Id.* It adds that his "requests for accommodation [had] been denied," that he "experienced [a hostile work environment]," and that he "suffered retaliation." *Id.* The EEO office accepted the complaint and initiated an investigation. PSOF ¶ 175; Burlack Decl. ¶ 92.

Between September 9, 2022, and September 14, 2022, Mr. Burlack sent three emails to Jillian Carilli, an attorney in the Smithsonian's EEO office, in which he reported additional events that he wanted to add to his administrative complaint. JSOF ¶ 109; Carilli Decl. ¶ 1. In the first email, Mr. Burlack stated that Ms. Clark did not inform him of a pay differential for employees working Sundays. Carilli Decl., Ex. D at 30, ECF No. 36-8. He also said that Ms. Clark told him that she had no telework for him, which meant that he had to take leave without pay. *Id.* In the second email, Mr. Burlack complained that he was meant to have a mid-year review in April, but it did not occur until July. *Id.* at 31. And in the third email, Mr. Burlack reported that he had a work schedule of "onsite 3 days and telework two days." *Id.* at 39. He wrote that Ms. Clark told him that she lacked telework for him, and that Ms. Clark determined that he could not assist with telework for the CRC because he "did not have the skillset." *Id.* Ms. Clark's refusal to assign him telework, he said, required him "to take leave without pay." *Id.*

10

The EEO office interpreted these amendments as asserting four additional claims that it accepted for investigation: (1) that Ms. Clark conducted Mr. Burlack's mid-year review three months late; (2) that Ms. Clark and Ms. Termin required him to provide reports at the end of his telework shifts; (3) that Ms. Clark failed to inform him of a pay differential for his Sunday shifts; and (4) that Ms. Clark failed to provide him telework options or inform him that other departments had available telework, requiring him to take leave without pay. JSOF ¶ 110. The EEO office did not issue a final decision. Burlack Decl. ¶ 92.

### B.    Procedural Background

Mr. Burlack sued the Secretary of the Smithsonian Institution on July 14, 2023. ECF No. 1. Nearly two years of discovery followed. *See* Order (Oct. 8, 2023), ECF No. 8; Min. Order (June 6, 2025). During summary-judgment briefing, the Court granted Mr. Burlack's request for leave to amend his Complaint to change the statutory basis for one of his claims. Min. Order (Mar. 26, 2026); *see* ECF No. 25. The operative Amended Complaint asserts nine claims, including claims of national-origin discrimination, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; as well as disability discrimination, retaliation, failure to make reasonable accommodations, and hostile work environment in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.* Am. Compl. ¶¶ 84–161, ECF No. 35. The Secretary has moved for summary judgment. Mot., ECF No. 36. That motion is fully briefed and ripe for review. *See* Opp'n, ECF No. 38; Reply, ECF No. 40.[2]

---

[2] Mr. Burlack has moved for leave to file a sur-reply, arguing that the Secretary's Reply raised new arguments and introduced new evidence to which he is entitled to respond. ECF No. 41. Because the Court does not rely on any of the arguments or evidence to which Mr. Burlack's proposed sur-reply responds, the Court will deny his motion as moot.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The burden is on the movant to make the initial showing of the absence of any genuine issues of material fact." *Ehrman v. United States*, 429 F. Supp. 2d 61, 66 (D.D.C. 2006). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Est. of Parsons*, 651 F.3d at 123. "Courts must avoid making credibility determinations or weighing the evidence, since credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Rothberg v. Xerox Corp.*, No. 12-cv-617, 2016 WL 10953882, at *10 (D.D.C. Feb. 3, 2016) (cleaned up) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)). But a court may "evaluate an inadequately supported assertion of material fact and deem it not materially disputed." *Id.* (quoting *Grimes v. District of Columbia*, 794 F.3d 83, 92 (D.C. Cir. 2015)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

12

<b>DISCUSSION</b>

The Secretary seeks summary judgment on Mr. Burlack's nine claims. The Court agrees that summary judgment is appropriate. As for his reasonable-accommodation claim, Mr. Burlack failed to exhaust the administrative process for one of the two instances when he contends that the Museum denied his request for an accommodation. The remaining reasonable-accommodation claim—as well as his claims for discrimination, retaliation, and hostile work environment—otherwise fail on the merits.

### A.    Reasonable Accommodation

Mr. Burlack's reasonable-accommodation claim is at the center of his case, so the Court starts there. That claim raises two issues. First, whether Mr. Burlack administratively exhausted his reasonable-accommodation claim based on his requested reassignment to another unit. Second, whether the exhausted portion of that claim survives summary judgment. The Court takes each in turn and concludes that it must dismiss this claim in part and otherwise grant summary judgment.

#### 1.    Exhaustion

"A federal employee bringing claims under Title VII and the Rehabilitation Act must timely exhaust administrative remedies before filing suit in federal district court." *Sandler v. Blinken*, No. 21-cv-2226, 2022 WL 4547557, at \*4 (D.D.C. Sep. 29, 2022). "The exhaustion requirement 'serves the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication and decision.'" *Camero v. Vilsack*, No. 19-cv-1558, 2022 WL 17752204, at \*2 (D.D.C. Dec. 19, 2022) (quoting *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995)).

Courts in this Circuit treat administrative exhaustion under Title VII and the Rehabilitation Act differently. "For Title VII claims, a plaintiff's failure to exhaust her administrative remedies does not deprive the Court of jurisdiction." *Sandler*, 2022 WL 4547557, at \*4 (cleaned up). "In

13

contrast, this circuit considers failure to administratively exhaust a Rehabilitation Act [claim] by failing to pursue a particular claim before the agency a jurisdictional defect." *Id.* at \*5. Although the Secretary does not pitch his exhaustion argument under the Rehabilitation Act as jurisdictional, in these circumstances the "exhaustion argument is construed as a motion to dismiss for lack of subject-matter jurisdiction." *Id.*; *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action.").

"To exhaust administrative remedies for Rehabilitation Act and Title VII claims, a complainant must complete two steps." *Camero*, 2022 WL 17752204, at \*2. First, "an employee must initiate contact with an EEO Counselor in her agency within 45 days of the date of the matter alleged to be discriminatory," *Wallace v. Wright*, No. 24-cv-2906, 2025 WL 3042025, at \*3 (D.D.C. Oct. 31, 2025) (cleaned up), to "try to informally resolve the matter," 29 C.F.R. § 1614.105(a). "Second, if the matter is not resolved through informal counseling, the complainant must file a formal administrative complaint within 15 days of receipt of notice from the Counselor of the right to file a complaint." *Camero*, 2022 WL 17752204, at \*2. And "[f]ailure to take either of these steps precludes the complainant from filing suit in federal court." *Id.*

Here, the Secretary argues that Mr. Burlack failed to exhaust one aspect of his reasonable-accommodation claim under the Rehabilitation Act: the Museum's failure to reassign him to another unit. Mot. 9; Reply 4. The Court agrees. Mr. Burlack's formal complaint in February 2022, JSOF ¶ 108, stated that his "requests for accommodation [had] been denied," Carilli Decl., Ex. B. But that complaint could not have encompassed his request for reassignment

14

because he first made the request on a phone call with Ms. Gover in August 2022, *see* Mot., Ex. 61 at SI_3508.[3]

It is true that Mr. Burlack then amended his formal complaint through a series of emails in September 2022. JSOF ¶ 109. In the one relevant here, Mr. Burlack wrote that in "[t]he last couple of weeks [he] asked [his] supervisor for telework," but she replied "that she has none." Carilli Decl., Ex. D at 39. After referencing Ms. Clark's refusal to permit him to volunteer at the CRC, he adds that she had been "blocking every attempt for telework." *Id.* When the Smithsonian's EEO office accepted this claim for investigation, it described it as follows: "[O]n or about August 2022, Plaintiff's supervisor, Janet Clark, failed to notify Plaintiff that other departments had telework available or provide telework options for Plaintiff, instead advising Plaintiff that she had no telework available. This resulted in Plaintiff having to take Leave Without Pay (LWOP)." JSOF ¶ 110. As that framing properly reflects, Mr. Burlack complained that he was being given insufficient telework, not that he had been denied a requested reassignment to the CRC. Because

---

[3] The Secretary identifies some supplemental interrogatory responses by Mr. Burlack suggesting that he requested a transfer at an earlier point. Mot. 10 n.2, 30–31, ECF No. 36. He contends that "[i]f [Mr. Burlack] intends to rely on [those] supplemental interrogatory responses . . . to assert that he requested" reassignment "before filing his formal administrative complaint of discrimination," the Court should apply the so-called "sham affidavit" rule to reject that attempt. Mot. 30 (citing *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007)). In his Opposition, Mr. Burlack (in a lengthy footnote) disputes application of the sham affidavit rule, Opp'n 28 n.34, ECF No. 38, but he does not rely on the supplemental interrogatory responses in answering the Secretary's arguments about exhaustion, *see* Opp'n 16–21. Thus, he has conceded reliance on the responses to oppose that argument. *See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004); *see also CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("A footnote is no place to make a substantive legal argument on appeal; hiding an argument there and then articulating it in only conclusory fashion results in forfeiture.").

Mr. Burlack did not submit a formal complaint that he was denied a reassignment as an accommodation, the Court concludes that he failed to exhaust that aspect of his claim.

Mr. Burlack does not meaningfully dispute any of this. Instead, he makes two arguments in an attempt to save this claim: (1) that the Museum's failure to reassign him was part of an ongoing failure to accommodate his disabilities, Opp'n 17–19; and (2) that the Court should equitably toll "the limitations periods for not exhausting administrative remedies," Opp'n 19–21. Neither argument is persuasive.

First, the Museum's decision not to transfer Mr. Burlack cannot be assimilated into his February 2022 complaint as part of an ongoing failure to accommodate. As an initial matter, it is questionable whether a separate request for accommodation can be exhausted under such a theory. *See, e.g.*, *Hollingsworth v. Vilsack*, No. 23-cv-2427, 2024 WL 4332118, at *6–7 (D.D.C. Sep. 27, 2024) (explaining that courts in this District are divided on whether *Nat'l R.R. Corp. v. Morgan*, 536 U.S. 101 (2002), abrogated D.C. Circuit precedent and forbade this theory); *Wallace*, 2025 WL 3042025, at *3 (noting that "denial of an accommodation request" is generally considered a discrete act that must be separately exhausted). But even assuming that this is a viable theory of exhaustion, it fails here. Mr. Burlack's claim relating to reassignment is not "reasonably related" to his complaint about denial of a telework accommodation—the former would not "arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Camero*, 2022 WL 17752204, at *3 (quoting *Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 526–27 (D.C. Cir. 2019)). That is because, as explained below, Mr. Burlack in fact received the telework accommodation he asked for—so his complaint about his telework accommodation would not have reasonably prompted the agency to investigate a transfer accommodation that he did not complain about.

16

Second, there is no basis for equitable tolling. There is again a threshold problem with Mr. Burlack's argument: equitable tolling is an awkward tool to address his failure to exhaust. "Equitable tolling effectively extends an otherwise discrete limitations period set by Congress[.] [I]t pauses the running of, or 'tolls' a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him bring bringing a timely action." *Nelson v. SEC*, 138 F.4th 514, 521 (D.C. Cir. 2025) (quoting *Arellano v. McDonough*, 598 U.S. 1, 6 (2023)). Here, it is not clear what deadline Mr. Burlack wants tolled—he says only that the Court should toll "the limitations periods" "for not exhausting administrative remedies." Opp'n 19. But Mr. Burlack does not claim that he exhausted this claim outside a relevant deadline; instead, he appears *never* to have exhausted this claim. Equitably tolling the deadline for exhaustion is not the same as waiving that requirement. And even taking this argument on its face, nothing in this case presents the sort of "extraordinary circumstance" necessary for tolling. *Nelson*, 138 F.4th at 521. In support of his request for equitable tolling, Mr. Burlack invokes the same assertions of discrimination and failure to accommodate that underlie his claims on the merits. Opp'n 20–21. But even if actionable, that conduct is a far cry from the sort of "extraordinary and carefully circumscribed instances" that can support tolling. *Ricci v. Kerry*, No. 11-cv-2185, 2013 WL 5329049, at *3 (D.D.C. Sep. 23, 2013) (quoting *Commc'ns Vending Corp of Ariz., Inc. v. FCC*, 365 F.3d 1064, 1075 (D.C. Cir. 2004)).

In sum, Mr. Burlack failed to exhaust his claim that the Museum did not accommodate his disabilities by not reassigning him to another unit. The Court must dismiss that claim without prejudice for lack of jurisdiction.

### 2.    Merits

The Court turns to the merits of the remaining aspects of Mr. Burlack's reasonable-accommodation claim. The Rehabilitation Act of 1973 governs employee claims of disability discrimination against the federal government. *Ward v. McDonald*, 762 F.3d 24, 28 (D.C. Cir. 2014). "Its basic tenant is that the Government must take reasonable affirmative steps" to accommodate employees with disabilities, "except where undue hardship would result." *Id.* (quoting *Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1993)). The Rehabilitation Act is nearly a twin of the Americans with Disabilities Act (ADA), a principal difference being that "the Rehabilitation Act only applies to federal agencies and departments, federal programs, and recipients of federal funding, whereas the ADA applies to all entities that provide services to the public." *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 266 n.10 (D.D.C. 2015).

Like the ADA, the Rehabilitation Act "require[s] employers to 'mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *Menoken v. Dhillon*, 975 F.3d 1, 7 (D.C. Cir. 2020) (quoting 42 U.S.C. § 12112(b)(5)(A)). To prove a "violation of the Rehabilitation Act's reasonable accommodation requirements, a plaintiff must [establish] that '(i) she was disabled within the meaning of the Rehabilitation Act; (ii) her employer had notice of her disability; (iii) she was able to perform the essential functions of her job with or without reasonable accommodation; and (iv) her employer denied her request for a reasonable accommodation of that disability.'" *Id.* (quoting *Solomon v. Vilsack*, 763 F.3d 1, 9 (D.C. Cir. 2014)).

"Once an employee requests a reasonable accommodation, the employer should engage in an 'interactive process with the . . . individual with a disability in need of the accommodation.'" *Congress v. Gruenberg*, 643 F. Supp. 3d 203, 226 (D.D.C. 2022) (quoting 29 C.F.R.

18

§ 1630.2(o)(3)). "The process contemplated is 'a flexible give-and-take' between employer and employee 'so that together they can determine what accommodation would enable the employee to continue working.'" *Ward*, 762 F.3d at 32 (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)). To establish that his employer denied his request for a reasonable accommodation, "a plaintiff must show either that the agency in fact ended the interactive process or that it participated in the process in bad faith." *Minter v. District of Columbia*, 809 F.3d 66, 69 (D.C. Cir. 2015) (cleaned up).

Mr. Burlack clearly thinks that the Smithsonian failed to adequately accommodate his disabilities. But it is difficult to pin down what exactly he thinks it did wrong. He appears to agree that his partial telework schedule provided him a sufficient accommodation through June 2022. *See* Opp'n 38–39. At that point, he says, the Smithsonian "ripped away" his telework accommodation. Opp'n 39. And he claims that afterward, the Smithsonian "failed to meet or communicate" with him about how it could "implement the telework portion of the agreement that would put [him] on the same footing as a non-disabled person." Opp'n 38.

The problem for Mr. Burlack is that he identifies nothing in the record supporting that the Smithsonian stopped honoring his partial telework schedule in June 2022. To the contrary, his timesheets from June and July 2022 reflect that Mr. Burlack continued to telework two (or even three) days a week. Reply, Ex. 81 at SI_3024–31, ECF No. 40-2. And that is consistent with emails from Ms. Clark in March 2022 and August 2022—*i.e.*, both before and after she purportedly forbade Mr. Clark from teleworking—stating that Mr. Burlack could telework two days a week. *See* Mot., Ex. 55 at SI_2969, ECF No. 36-6 (March 15, 2022, email stating that Mr. Burlack could "continue to telework on Saturdays and Sundays"); JSOF ¶ 86 ("On August 2, 2022, Ms. Clark responded to [Mr. Burlack's] email, confirming that his schedule would be limited to three on-site

19

days."). Any reasonable jury reviewing this evidence would conclude that the Smithsonian maintained Mr. Burlack's partial telework schedule through the summer of 2022.

The only evidence that Mr. Burlack identifies to support that his work arrangement changed in June 2022 is his own declaration. *See* Opp'n 9. In that declaration, he states that on June 6, 2022, Ms. Clark told him that "there was no more telework available and that [he] was expected to work [his] entire schedule in-person." Burlack Decl. ¶ 97. Even assuming the accuracy of this assertion, *Est. of Parsons*, 651 F.3d at 123, the declaration does not go on to explain how Ms. Clark prevented Mr. Burlack from teleworking. And given that—as mentioned— Mr. Burlack's timesheets reflect at least two days of telework each week in June and July 2022, his assertion about what Ms. Clark told him is insufficient to create a genuine dispute about whether the Smithsonian retracted his partial telework schedule. *See Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 61 (D.D.C. 2015) ("[S]ummary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements." (quoting *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 195 (D.D.C. 2008))).

To be sure, the Parties both agree that in August and September 2022, Ms. Clark anticipated that Mr. Burlack would return to a five-days-on-site schedule. *See* JSOF ¶ 91. But the record demonstrates that Mr. Burlack gave Ms. Clark that impression. In August 2022, he told Ms. Clark that he would shortly visit his doctor to "see if [he would] be cleared 5 days a week." JSOF ¶ 88. And when Ms. Clark later asked about him returning to a five-days-on-site schedule, he responded that he "always intended on going back to a M-F schedule." JSOF ¶ 91–92. Given these statements, Ms. Clark could hardly be faulted for expecting that Mr. Burlack would soon return to fully on-site work. And more saliently, Mr. Burlack has failed to identify any evidence

permitting a reasonable jury to conclude that Ms. Clark denied him the accommodation that he requested.

Because Mr. Burlack hinges his reasonable-accommodation claim on a supposed change in his telework schedule in June 2022, his failure to identify evidence reflecting any change is fatal, and the Court must grant summary judgment. *See* Fed. R. Civ. P. 56(c)(1).[4]

## B.        Disparate-Treatment Discrimination

Next up are Mr. Burlack's claims of discriminatory treatment. He has two: a Title VII claim of national-origin discrimination and a Rehabilitation Act claim of disability discrimination. Both claims involve application of a similar framework, and the Parties discuss them jointly. The Court follows their lead.

"Title VII of the Civil Rights Act makes it unlawful for an employer to 'fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin.'" *Brady v. Off. of the Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (quoting 42 U.S.C. § 2000e–2(a)(1)). Section 501 of the Rehabilitation Act prohibits "disability discrimination in federal employment," *Lucas v. Am. Fed'n of Gov't Emps.*, 151 F.4th 370, 379 n.5 (D.C. Cir. 2025), and provides that "[t]he standards used to determine whether th[at] section has been violated" shall be the same as under the ADA, 29 U.S.C. § 791(f).

---

[4] Mr. Burlack does not base his reasonable-accommodation claim on other aspects of his work arrangement. For instance, he does not argue that Ms. Clark's expectation that he use leave when unable to work on-site rendered his accommodation unreasonable, *see* Opp'n 26, and he affirmatively disclaims that his claim is based on the events surrounding his hip surgery, Opp'n 31 n.38. The Court expresses no view about whether any of these aspects of Mr. Burlack's work arrangement could support a reasonable-accommodation claim.

Courts analyze disparate treatment discrimination claims under both statutes using the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Brady*, 520 U.S. at 493; *Qashu v. Rubio*, 172 F.4th 28, 35 (D.C. Cir. 2026). "That framework operates in three steps. First, the plaintiff must establish a *prima* facie case of discrimination by alleging that he is part of a protected class . . . , he suffered a cognizable adverse employment action, and the action gives rise to an inference of discrimination." *Wade v. Fionta, Inc.*, No. 23-cv-1527, 2026 WL 904909, at *5 (D.D.C. Apr. 2, 2026) (cleaned up). After making out that case, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action." *Id.* (quoting *Dodson v. U.S. Capitol Police*, 633 F. Supp. 3d 235, 253 (D.D.C. 2022)). And finally, "if the employer articulates such a reason, the burden shifts back to the plaintiff, . . . who may defeat summary judgment by proving either that the defendant's legitimate, nondiscriminatory reason is a pretext for discrimination, or that the employment action was motivated by discrimination in addition to the proffered legitimate reason." *Id.* (cleaned up).

The D.C. Circuit has explained that at summary judgment, "[o]nce the employer asserts a legitimate, nondiscriminatory reason, the question whether the employee actually made a prima facie case is no longer relevant and thus disappears and drops out of the picture." *Id.* at *6 (quoting *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016)). At that point, "the 'one central inquiry' is 'whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.'" *Id.* (quoting *Wheeler*, 812 F.3d at 1114).

One more point of orientation before turning to the facts of this case. Under Title VII, a plaintiff may prevail by showing either that "a protected characteristic was a but-for cause of the

22

adverse employment action" or that the characteristic "was a motivating factor" for the action. *Savignac v. Day*, 754 F. Supp. 3d 135, 164 n.8 (D.D.C. 2024). But the courts of appeals disagree about the standard for a claim under Section 501 of the Rehabilitation Act. *Contrast, e.g., Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008) (borrowing from the ADA to impose a motivating-factor standard), *with Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 580 (6th Cir. 2022) (borrowing from the ADA to impose a but-for standard). And in this Circuit, much remains unsettled. The upstream question of "[w]hether the ADA incorporates by cross-reference to Title VII the latter's motivating-factor standard remains . . . open." *Haughton v. District of Columbia*, 819 F. App'x 1, 2 (D.C. Cir. 2020) (per curiam). And the Circuit has not answered whether—assuming that the ADA contemplates a motivating-factor test—that test flows through to Section 501 of the Rehabilitation Act. *Cf. Drasek v. Burwell*, 121 F. Supp. 3d 143, 154 (D.D.C. 2015) (collecting cases concluding that the ADA's causation standard does not apply to claims under Section 504 of the Rehabilitation Act). Here, however, the Court need not decide whether Section 501 calls for a but-for or a motivating-factor standard. The Court identified the circuits' divergent views for the Parties prior to summary judgment briefing, Min. Order (Mar. 26, 2026), yet both Parties agree that for purposes of resolving the Secretary's motion, the Court should apply a but-for test. Mot. 11; Opp'n 21–22. Accordingly, the Court will use that test here.

Now to apply these principles. Although his Opposition is not entirely clear, it seems that Mr. Burlack believes that his supervisors discriminated against him on several occasions: (1) when Ms. Termin suspended him for one day in January 2022, (2) when Ms. Clark denied Mr. Burlack's request to volunteer at the CRC, and (3) when his supervisors failed to accommodate his disabilities. *See* Opp'n 25–33. For all these incidents, he does not say whether he believes that the Museum discriminated based on his national origin, disabilities, or both. Regardless, Mr. Burlack

23

has not identified record evidence sufficient to permit his disparate-treatment claims to survive summary judgment.

*One-day suspension*. In January 2022, Ms. Termin suspended Mr. Burlack for one day after sustaining a charge that he had failed to follow leave procedures. PSOF ¶¶ 83–84. Mr. Burlack does not dispute that he failed to follow leave procedures. *See* Opp'n 23, 25. Instead, he argues that his failure was caused by a mental health crisis and that Ms. Termin's stated reason for the suspension was pretextual. Opp'n 24–25, 30–31. Neither argument carries the day.

First, Mr. Burlack has conceded any argument that the relationship between his disabilities and his failure to follow leave procedures saves this claim from summary judgment. In its Motion for Summary Judgment, the Secretary argued that an employer does not discriminate when it disciplines an employee for misconduct, even when the misconduct is related to the employee's disability. *See* Mot. 21 (citing cases); *see also* Reply 10. Mr. Burlack responds to this argument only in a footnote, saying that the Secretary's cited cases are "inapt" because they "entailed disqualifying egregious misconduct." Opp'n 25 n.30. But Mr. Burlack does not respond to the Secretary's underlying argument: that misconduct may serve as a basis for discipline even when the misconduct is disability related. By failing to respond to that point, Mr. Burlack has conceded it. *See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004); *see also CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("A footnote is no place to make a

24

substantive legal argument on appeal; hiding an argument there and then articulating it in only conclusory fashion results in forfeiture.").[5]

That leaves Mr. Burlack's pretext argument. He contends that Ms. Termin's rationale for imposing discipline was inconsistent and illogical, evidencing that the real reason for the discipline was discrimination. Opp'n 31–32; *see Wade*, 2026 WL 904909, at *8 ("The D.C. Circuit has recognized that 'shifting and inconsistent justifications' for an adverse employment action can be 'probative of pretext.'" (quoting *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011))). Ms. Termin explained that she suspended Mr. Burlack for one day because "there were areas where it just doesn't matter that there are things you have to do within our system, and he just needed to learn to follow simple things, and those simple things would cause a lot of these problems to go away, meaning get your doctor slips in, get your records to the accessibility office." Mot., Ex. 3 83:9–15, ECF No. 36-2. She noted also that Mr. Burlack "needed to know that he did have responsibilities in some way that he had to meet in order to be a functioning member of the [Museum] work team." *Id.* 83:25–84:3.

Mr. Burlack finds these explanations "incoherent" because Ms. Termin decided to issue a one-day suspension while simultaneously rejecting discipline for his absences. Opp'n 31–32. His point is that because Ms. Termin found his "mental health condition" to be a "mitigating factor in favor of lowering the length of the suspension," it was inconsistent to nevertheless decide that discipline was necessary. *Id.* As the Secretary correctly points out, this argument is "counterintuitive." Reply 11. Counting an employee's disabilities as a mitigating factor supporting lesser discipline is hardly inconsistent with finding that discipline is nevertheless necessary. No

---

[5] The Court notes that there is a circuit split on this question. *See Iyer v. George Washington Univ. Sch. of Med. & Health Sci.*, No. 24-cv-130, 2026 WL 1864049, at *8 n.5 (D.D.C. June 29, 2026). But because Mr. Burlack has conceded this point, the Court need not address the split.

reasonable jury could find that Ms. Termin's imposition of a one-day suspension was inconsistent with her expressed purpose of ensuring that Mr. Burlack would "learn to follow simple things" and that "he did have responsibilities . . . that he had to meet." Mot., Ex. 3 83:11–84:2.

Mr. Burlack also points to an email that Ms. Termin sent him in July 2020. Opp'n 30. In that email—which appears to have been intended for a different recipient—Ms. Termin laments that Mr. Burlack "has no self motivation, totally wastes an 11 position with his disfunctional [sic] work ethic and will do whatever it takes to just get by." Mot., Ex. 9, ECF No. 36–3. Mr. Burlack argues that the email shows Ms. Termin's "clear antipathy" toward him. Opp'n 30. Although a jury might agree, Mr. Burlack identifies nothing in the record indicating that Ms. Termin's feelings about him were based on his disabilities or his national origin. He cites nothing that would permit a reasonable jury to agree that Ms. Termin based his one-day suspension on his protected characteristics. And that is dispositive.

*Volunteering at the CRC.* Next, Mr. Burlack contends that Ms. Clark's refusal to let him volunteer at the CRC was discriminatory. *See* Opp'n 26, 32. Assuming that the refusal was an adverse employment action that can support Mr. Burlack's discrimination claims, *see Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (explaining that decisions implicating "the what, where, and when" of an individual's employment affect the employment's terms and conditions within the meaning of Title VII), these claims nevertheless cannot survive summary judgment. The record evidence reflects that Ms. Clark refused Mr. Burlack's request because she believed that he was unqualified for the volunteer work at the CRC. Opp'n, Ex. 23 at 1 (email from Mr. Burlack stating that Ms. Clark refused his request because she "seem[ed] to think [he didn't] have the skillset to complete the work"); Mot., Ex. 2 84:9–21, ECF No. 2 ("[T]here were software programs used . . . that we do not use; we are not familiar with. There were specific duties that based on my years

26

with Mr. Burlack, I did not feel that he would be able to do in a timely fashion[.] . . . I did not feel that there was work there that Mr. Burlack could step into, do in a timely fashion, do correctly without any help and actually assist the project."). Indeed, in asking to do this work, Mr. Burlack himself expressed to Ms. Clark that he could "do some of [the tasks] with instruction." Mot., Ex. 59 at SI_3465, ECF No. 36-6. But Ms. Clark believed that the "whole point" of the CRC's request for volunteers "was to find people who already knew how to do these things, who could jump in, do them, turn them over"; "there wasn't time in this project to learn how to do it. You had to come in and do it." Mot., Ex. 2 144:2–14.

Mr. Burlack seems to respond that he was qualified for this work, noting that he has been consistently rated as a successful employee. *See* Opp'n 28, 32. He points to nothing in the record, however, indicating that Ms. Clark's assessment of his ability to contribute to the CRC was pretextual. *Cf. Moore v. Prtizker*, 204 F. Supp. 3d 82, 96 (D.D.C. 2016) ("[The plaintiff's] disagreement with the employer's assessment of her work is not, without more, sufficient to establish pretext."); *Robertson v. Dodaro*, 767 F. Supp. 2d 185, 192 (D.D.C. 2011) ("[A]n employee's subjective assessment of her own performance is insufficient to establish such pretext evidence."). Mr. Burlack himself characterizes Ms. Clark's refusal as being motivated by her belief that he had "a poor work ethic." Opp'n 34–35. Regardless of whether Ms. Clark's assessment was correct, the point is that Mr. Burlack has not identified evidence permitting a reasonable jury to conclude that Ms. Clark's refusal to let him work at the CRC was because of his disabilities or his national origin.

*Failure to accommodate*. Finally, Mr. Burlack argues that his supervisors discriminated against him by failing to accommodate his disabilities. *See* Opp'n 32, 34–35. He focuses on Ms. Clark's purported demand that he return to fully on-site work in June 2022 and the Museum

27

rebuffing his efforts to be reassigned to another unit. As an initial matter, the Secretary argues that a failure to accommodate cannot support a disparate-treatment claim. Mot. 18–19. Mr. Burlack does not respond to that argument. *See* Opp'n 25–33. Setting that aside, this theory still fails. As discussed above, no reasonable jury could agree that Ms. Clark discontinued Mr. Burlack's partial telework schedule in June 2022. And as for his requests for reassignment, the Secretary asserts that it refused those requests because the Museum "was providing the accommodation that his doctors requested"—*i.e.*, the partial telework schedule. Reply 20. Mr. Burlack cites nothing supporting that this explanation is pretextual or that the Museum's refusals were based even partly on his disabilities or his national origin.

In sum, none of Mr. Burlack's disparate-treatment claims can survive summary judgment. The Court must grant the Secretary's motion with respect to each of these claims.

### C.    Retaliation

Mr. Burlack also raises retaliation claims. The Parties again discuss the retaliation claims under the Rehabilitation Act and Title VII jointly, and the Court again follows their lead. To establish a retaliation claim under either statute, "a plaintiff must show: (1) that he opposed a practice made unlawful by [the statute]; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action 'because' the employee opposed the practice." *Touvian v. District of Columbia*, 330 F. Supp. 3d 246, 251 (D.D.C. 2018) (Title VII) (quoting *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012)); *Zeigler v. Potter*, 641 F. Supp. 2d 25, 29 (D.D.C. 2009) (Rehabilitation Act).

Although Mr. Burlack's Opposition is not especially clear about the protected activity underlying these claims, he seems to focus on his written response to Ms. Clark's proposed suspension in November 2021, JSOF ¶ 46, and his requests for reasonable accommodation. *See*

Opp'n 33–34. And it appears that he believes that the Museum took adverse action by (1) removing his job responsibilities after his return to work in December 2021, (2) revoking his partial telework schedule in June 2022, and (3) refusing to reassign him to another unit. Opp'n 34–35. As for Mr. Burlack's telework schedule, as discussed above, no reasonable jury could agree that the Museum revoked that schedule in June 2022. Likewise, no reasonable jury could agree that the Museum refused to reassign Mr. Burlack because of his protected activity—he has not controverted the Secretary's explanation that it refused his requests for reassignment because it "was providing the accommodation that his doctors requested." Reply 20.

That leaves his assertion that the Museum removed his job responsibilities. Mr. Burlack asserts that when he returned to work in December 2021, he was no longer working on "procurement" or "assisting with staging Public Programs events." Opp'n 34. But nothing in the record indicates that was because his supervisors were retaliating for his protected activity. Ms. Clark explained that as the pandemic abated, the Museum "did a lot of things with in-house people or local people that didn't require the same level of procurement." Mot., Ex. 2 28:19–21; *see also* Mot., Ex. 3 26:9–18 (Ms. Termin explaining that although Mr. Burlack retained his procurement responsibilities, "we didn't do them [the] same amount anymore because things have changed"). And although she assigned Mr. Burlack "some procurement," that work "was not being done in a timely fashion"—which caused her "to pull back . . . because [she] did not have the confidence that what [she] assigned to him would get done in the timely manner." *Id.* 29:4–11. As for staging Public Programs events, although Mr. Burlack had previously created signs for such events, he himself admitted that when he returned to work there was "an office that d[id] that," so there was "no need for [him] to go in and be doing that." Mot., Ex. 1 19:24–20:1, ECF No. 36-2; *see* Mot., Ex. 2 27:13–14 ("We used to design our own signs and do our own signs.").

Mr. Burlack points to nothing indicating that these explanations are pretextual. Opp'n 33–36. In the absence of any such evidence, no reasonable jury could conclude that the Museum stripped Mr. Burlack's job responsibilities because of his protected activity.

### D.     Hostile Work Environment

The last stop is Mr. Burlack's hostile work environment claims. Yet again, the Parties discuss Mr. Burlack's Rehabilitation Act and Title VII claims jointly, and yet again this Court will do the same.

"A plaintiff may 'establish a violation of Title VII by proving that the employer created or condoned a discriminatorily hostile or abusive environment.'" *Wade*, 2026 WL 904909, at *9 (quoting *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 187–88 (D.D.C. 2012)). "[N]either the Supreme Court nor the D.C. Circuit," however "has expressly held that hostile work environment claims are cognizable under the . . . Rehabilitation Act." *Bain v. Off. of the Att'y Gen.*, 648 F. Supp. 3d 19, 59 (D.D.C. 2022). But "other circuits have so held, and numerous decisions in this circuit, including of the courts of appeals, have generally assumed the same." *Id.* (collecting cases). The Secretary does not "argue to the contrary, so the Court will make the same assumption at this stage of the litigation." *Id.*

"To prevail on a hostile work environment claim, a plaintiff must show that his employer subjected him to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment." *Baird v. Gotbaum*, 662 F.3d 1246, 1250 (D.C. Cir. 2011) (cleaned up). Courts look to the "totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008). To succeed, a plaintiff must show

both that he held "a subjective belief that he experienced a hostile work environment," and that "the workplace was objectively hostile, as judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Wade*, 2026 WL 904909, at *9 (cleaned up).

Here, Mr. Burlack relies on the same arguments that he made in support of his other claims—*e.g.*, that Ms. Clark revoked his partial telework schedule, that his supervisors mistakenly sent him a critical email, and that Ms. Clark refused to permit him to work at the CRC. Opp'n 42–43. Those reasons fail for much the same reasons explained above. Additionally, "[c]ourts have routinely held that hostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class." *Jeter v. FBI*, No. 25-cv-2275, 2026 WL 1707625, at *5 (D.D.C. June 12, 2026) (cleaned up). And Mr. Burlack identifies no evidence linking these issues with his protected characteristics. At bottom, this kind of workplace friction—though unpleasant—is "the kind of ordinary tribulation of the workplace that does not give rise to a hostile workplace claim." *Wade*, 2026 WL 904909, at *9 (cleaned up). The Court must grant the Secretary summary judgment with respect to these claims, too.

## CONCLUSION

For the foregoing reasons, the Court grants the Secretary's Motion for Summary Judgment, ECF No. 36. The Court dismisses without prejudice Mr. Burlack's failure to accommodate claim based on the Museum's refusal to reassign him for lack of subject matter jurisdiction. The Court

grants summary judgment to the Secretary on all other claims. The Court denies as moot the Plaintiff's Motion for Leave to File Sur-Reply, ECF No. 41.

A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:   July 23, 2026

32